## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAAD M. SOLIMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-1378 (GMS) |
| | ) |
| STANLEY TAYLOR; PAUL HOWARD; | ) |
| THOMAS CARROLL; LAWRENCE | ) JURY TRIAL DEMANDED |
| McGUIGAN; JAMES LUPINETTI; DAVID E. | ) |
| PIERCE, Jr.; JOSEPH B.RICHARDSON; | ) |
| RONALD HOSTERMAN; CERTAIN | ) |
| UNKNOWN INDIVIDUAL EMPLOYEES OF | ) |
| THE DELAWARE DEPARTMENT | ) |
| OF CORRECTION; and STATE OF | ) |
| DELAWARE DEPARTMENT OF | ) |
| CORRECTION, | ) |
| | ) |
| Defendants. | ) |

---

## AMENDED PLAINTIFF'S ANSWERING BRIEF
## TO INDIVIDUAL DEFENDANTS' AND
## DEFENDANT STATE OF DELAWARE DEPARTMENT OF CORRECTION'S
## MOTIONS TO DISMISS/SUMMARY JUDGMENT
## PURSUANT TO RULES 12(b)(1), 12(b)(6) AND 56(C)

---

MARGOLIS EDELSTEIN
Jeffrey K. Martin, Esquire (#2407)
Timothy J. Wilson, Esquire (#4323)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680


THE LAW OFFICE OF
HERBERT G. FEUERHAKE
Herbert G. Feuerhake, Esquire (ID # 2590)
521 West Street
Wilmington, Delaware 19801
(302) 658-6101

*Attorneys for Plaintiff Saad Soliman*

Dated: September 26, 2005

## **TABLE OF CONTENTS**

Page No.

TABLE OF CITATIONS ……………………………………………………  iv

NATURE AND STAGE OF THE PROCEEDINGS …………………………  1

SUMMARY OF ARGUMENTS ……………………………………….……..  2

INTRODUCTION ……………………………………………………….……..  3

STATEMENT OF FACTS ………………………………………………………  5

ARGUMENT ……………………………………………………………………  13

I.    STANDARDS FOR MOTION TO DISMISS AND MOTION FOR
      SUMMARY JUDGMENT ………………………………..…………….  13

II.   DEFENDANTS' MOTIONS RELY ON SUBMISSIONS OUTSIDE
      THE PLEADINGS AND THEREFORE ARE PROPERLY CONSIDERED
      AS MOTIONS FOR SUMMARY JUDGMENT …………………………..  13

III.  PLAINTIFF'S AMENDED COMPLAINT BASES THE INDIVIDUAL
      DEFENDANTS' § 1983 LIABILITY UPON: (1) THEIR ACTIONS
      TAKEN IN THEIR INDIVIDUAL CAPACITIES; AND/OR (2) THEIR
      SUPERVISION OF SUBORDINATES CONDUCTED WITH DELIBERATE
      INDIFFERENCE AND WITH A CULPABLE STATE OF MIND TO THE
      PLIGHT OF MR. SOLIMAN………………………………………………  14

      a.   Plaintiff sufficiently pled his civil rights allegations …………… 14

      b.   Plaintiff Claims are Correctly Based upon Supervisory
           Liability – Not *Respondeat Superior*…………………………….. 16

IV.   PLAINTIFF FULFILLED HIS OBLIGATIONS UNDER THE PRISON
      LITIGATION REFORM ACT, 42 U.S.C. § 1997(E), WHEN HE FILED
      GRIEVANCES FOR ALL OF THE CONSTITUTIONAL VIOLATIONS
      FOR WHICH HE SEEKS RELIEF. ……………………………………………… 19

V.    DEFENDANTS MAY NOT PLACE A PLAINTIFF AT A
      HIGHER SECURITY LEVEL, DENY HIM PRISON
      EMPLOYMENT, DENY HIM REHABILITATIVE PROGRAMS,
      OR DENY HIM THE DOCUMENTATION REQUIRED
      FOR A COMMUTATION OF SENTENCE HEARING, IF
      SUCH DENIALS ARE BASED UPON HIS RACE, RELIGION
      OR AN EXERCISE OF FREE SPEECH ……………………………………..  25

VI.   THE DEPARTMENT OF CORRECTION IS A "PERSON" UNDER § 1983 ……. 27

ii

**Page No.**

VII.   THE DELAWARE GENERAL ASSEMBLY WAIVED STATE IMMUNITY BY
       ENACTING 18 *Del. C. § 6511,* ENTITLED "*DEFENSE OF SOVEREIGNTY
       PROHIBITED*"…………………………………….…………..…..    28


CONCLUSION …………………………………………………………..    30


**Tab No.**

Unreported Cases …………………………………………………….…..    1, 2

Affidavit of Saad Soliman, dated February 7, 2005 …………………………..    A

Affidavit of Timothy J. Wilson, Esquire, dated February 8, 2005 ……………    B

Sample Grievance Form (Form #584) ……………………………………….    C

Grievances of Saad Soliman, dated 9/17/04 through 1/7/05 …………………..    D

## TABLE OF CITATIONS

**Cases**                                                             **Page No.**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 91 L. Ed. 2d 202,
106 S. Ct. 2505 (1986) ……………………………………………………    13

*ARGOS v. Orthotec LLC*, 304 F. Supp. 2d 591, 595 (D. Del. 2004) ………..    13

*Blizzard v. Watson*, 892 F. Supp. 587, 597 (D. Del., 1995) …………………    26

*Block v. Potter*, 631 F.2d 233, 237 (3d Cir. 1980) …………………………..    26

*Boykins v. Ambridge Area School Dist.*, 621 F.2d 75, 80 (3d Cir. 1980) ……    15

*Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir. 1999, cert. den.
528 U.S. 1005 (1999) …………………………………………………..14, 15

*Church v. Dept. of Correction*, 2002 WL 31927434 *3 (D. Del. 2002) …….    17

*Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1144-1145
(3d. Cir. 1995) …………………………………………………………..    27

*Doe v. Cates*, 499 A.2d 1175, 1177 (Del. 1985) …………………………..28, 29

*Jackson v. Sherese Brewington-Carr*, 1999 U.S. Dist. LEXIS 535 ……………  26

*Krauss v. Keibler-Thompson Corp.*, 72 F.R.D. 615, 617 (D. Del., 1976) ……    14

*Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) ………………………………..    21

*Mitchell v. Horn*, 318 F.3d 523, 529 (3d. Cir. 2003) ……………………….. 21, 22

*Myers v. McAuley*, 2002 U.S. Dist. LEXIS 17001 *10 (D. Ill. 2002) ….. 19, 20, 21

*Pajewski v. Perry*, 363 A.2d 429, 433 (Del. 1976) ……………………………28, 29

*Pennsylvania v. Porter*, 659 F.2d 306, 323-324 (3d Cir. 1981) …………… 16, 17

*Peters v. Del. River Port Authority*, 16 F.3d 1346, 1350 (3d Cir. 1994) …..    27

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ………………….    16

*Rotolo v. Borough of Charleroi*, 532 F.2d 920 (3d Cir. 1976) ………………..    15

*Ruffin v. Taylor*, 166 F.Supp.2d 999 (D. Del.) ……………………………….. 23, 24

*Sample v. Diecks*, 885 F.2d 1099, 1112 (3d Cir. 1989) …………………… 16, 17, 19

**Cases**                                                                    **Page No.**

*Sandin v. Conner* 515 U.S. 472 (1995) ……………………………………    4

*Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) …………………………..   19

*Trump Hotels & Casino Resorts v. Mirage Resorts*, 140 F.3d 478,
483 (3d Cir. 1998) ……………………………………………………………..   13

*Williams v. Federal Bureau of Prisons and Parole Comm'n.*,
85 Fed. Appx. 299, 305 (3d. Cir. 2004) …………………………………………   26

*Wolff v. McDonnell*, 418 .U.S. 539, 555 (1974) ………………………………    4

**Statutes, Acts & Rules**

42 U.S.C. 1983 …………………………………………………    1, 2, 14, 16, 17, 27, 28

42 U.S.C. § 1997(E) ……………………………………………………………..   2, 19

18 Del. C. § 6511 ……………………………………………………….…   2, 28, 29

Federal Rules of Civil Procedure, Rule 12(b)(6) ……………………………..  1, 13

Federal Rules of Civil Procedure, Rule 12(b)(1) ………………………………    1

Federal Rules of Civil Procedure, Rule 56(c) ………………………………..  1, 13

## NATURE AND STAGE OF THE PROCEEDINGS

On October 21, 2004, Plaintiff Saad M. Soliman ("Plaintiff" or "Mr. Soliman") filed a Complaint with this Court against the Defendants, Stanley Taylor ("Defendant Taylor"), Paul Howard ("Defendant Howard"), Thomas Carroll ("Defendant Carroll"), Lawrence McGuigan ("Defendant McGuigan"), James Lupinetti ("Defendant Lupinetti"), David E. Pierce, Jr. ("Defendant Pierce"), Joseph Richardson ("Defendant Richardson"), Ronald Hosterman ("Defendant Hosterman") and State of Delaware Department of Correction ("DOC")(collectively "Defendants") based upon violations of his civil liberties by the Defendants acting under the color of state law pursuant to 42 U.S.C. § 1983.

On or about December 12, 2004, the Defendants filed two motions and accompanying briefs to dismiss/summary judgment pursuant to Rules 12(b)(1) and (6), and 56(c).  One Brief was filed by Defendant DOC ("DOC Opening Brief") and one by the individually named Defendants ("I.D. Opening Brief").  Mr. Soliman responds to both Opening Briefs with this single Answering Brief in opposition.

1

## SUMMARY OF ARGUMENTS

I.      BECAUSE DEFENDANTS' MOTIONS RELY ON SUBMISSIONS OUTSIDE THE PLEADINGS THEY MUST, THEREFORE, PROPERLY BE CONSIDERED MOTIONS FOR SUMMARY JUDGMENT.

II.     PLAINTIFF'S AMENDED COMPLAINT CORRECTLY BASES THE INDIVIDUAL DEFENDANTS' LIABILITY UPON: (1) ACTIONS TAKEN IN THEIR INDIVIDUAL CAPACITIES; AND/OR (2) THEIR SUPERVISION OF SUBORDINATES, CONDUCTED WITH DELIBERATE INDIFFERENCE AND WITH A CULPABLE STATE OF MIND TO THE PLIGHT OF MR. SOLIMAN.

III.    PLAINTIFF FULFILLED HIS OBLIGATIONS UNDER THE PRISON LITIGATION REFORM ACT, 42 U.S.C. § 1997(E), WHEN HE FILED GRIEVANCES RESPECTING ALL OF THE CONSTITUTIONAL VIOLATIONS FOR WHICH HE SEEKS RELIEF.

IV.     DEFENDANTS MAY NOT PLACE A PLAINTIFF AT A HIGHER SECURITY LEVEL, DENY HIM PRISON EMPLOYMENT, DENY HIM REHABILITATIVE PROGRAMS, OR DENY HIM DOCUMENTATION REQUIRED FOR A COMMUTATION OF SENTENCE HEARING, IF SUCH THESE ACTIONS ARE BASED UPON HIS RACE, RELIGION OR AN EXERCISE OF FREE SPEECH.

V.      THE DEPARTMENT OF CORRECTION IS A "PERSON" UNDER § 1983.

VI.     THE DELAWARE GENERAL ASSEMBLY WAIVED STATE IMMUNITY BY ENACTING 18 *Del. C. § 6511,* ENTITLED "DEFENSE OF SOVEREIGNTY PROHIBITED".

## INTRODUCTION

This case is rooted in racial and religious discrimination against an inmate who is a Muslim of Middle Eastern descent.

Due to a prison culture at the Delaware Correctional Center ("DCC") that imposes insufficient restriction on how employees deal with inmates, the biased and jaundiced attitude of DCC Internal Affairs Investigator Joseph Richardson against the Plaintiff, Saad Soliman, has been allowed to manifest itself in wrongful action. Mr. Soliman's claims also encompass actions and knowing inaction of several additional DCC employees (who apparently share Richardson's malignant attitudes).

In addition to receiving an entirely unjustified and brutal beating at the hands of Defendant Richardson, which stands on its own as a violation of his civil rights, Mr. Soliman has suffered a series of administrative rebuffs and irregularities that, due to their genesis in racial and national origin discrimination, are themselves cognizable as violations of Mr. Soliman's right to equal protection of the laws.

Mr. Soliman has been subjected to a prison system at DCC that is tolerant of lawlessness and discrimination, and operates to protect DCC employees at the expense of the civil rights of the inmates. The system is self-perpetuating because those with the power to correct the system fail to do so. Administrative indifference amounts to tacit encouragement of the climate of brutality. Ironically, a system such as DCC's, which gives employees wide reign to do what they will with the inmates, makes it *more difficult* for the inmates to successfully prosecute violations of their rights because they have few functional rules and

3

regulations upon which to base their claims, and the "code of silence" that is followed by the employees of DCC gives the inmates little recourse in terms of corroborating testimony. This anomaly was recognized by Justice Ginsburg in *Sandin v. Conner* 515 U.S. 472 (1995):

> [A] State that scarcely attempts to control the behavior of its prison guards may, for that very laxity escape constitutional accountability; a State that tightly cabins the discretion of its prison workers may, for that attentiveness, become vulnerable to constitutional claims. An incentive for ruleless prison management disserves the State's penological goals and jeopardizes the welfare of prisoners.

515 U.S. at 490.

With this in mind, it was with great courage that Mr. Soliman filed this lawsuit, because the threat of renewed retaliation by prison employees, as a result of such a filing, is an ever-present concern. However, Mr. Soliman's failure to stand would not only prevent this Court from righting the wrongs that occurred to him, but would also leave the door wide open for future wrongdoing to be inflicted upon other inmates in the same cancerous spirit. It is his hope that success in this lawsuit will open the eyes of the public, and those of the Governor and the legislature, to the sorry conditions in our prisons.

Mr. Soliman asks this Court to reestablish a concept that the Defendants have failed to recognize in their dealings with him, but that separates our system of laws from arbitrary despotism, namely: "[P]risoners do not shed all constitutional rights at the prison gate ..." *Wolff v. McDonnell*, 418 .U.S. 539, 555 (1974).

4

## STATEMENT OF FACTS

Plaintiff incorporates into this Brief all facts as set forth in the Amended Complaint. Key points will, however, be reiterated in this Statement of Facts.

Plaintiff Saad Soliman is an inmate at the Delaware Correctional Center ("DCC"). He is also a devout Muslim of Middle Eastern (Egyptian) descent. With the exception of the brief time period during the early years of Mr. Soliman's incarceration, he has effectively functioned within the prison system as a model inmate. Mr. Soliman has followed the rules and availed himself of many of the positive programs offered at DCC. Due to his good behavior while incarcerated, Mr. Soliman earned housing at the lowest security level at DCC. His low security status even permitted him to have a job outside of the prison working for DelDOT, where he participated in computer-aided design of concrete construction.

Despite Mr. Soliman's adherence to the prison rules, he has nevertheless been subjected to brutal and unconscionable violations of his civil rights at DCC. These violations are the product of racial and religious discrimination that permeates the DCC as well was retaliation for his exercise of his right to free speech. Although Mr. Soliman was subjected to discrimination by DCC employees prior to the spring of 2004, it was in April of that year when his problems at the DCC exacerbated to an unconscionable level. The event that set the wheels in motion was the filing, by Mr. Soliman's criminal defense attorney, of a Petition for Commutation of Sentence on April 7, 2004.

After this filing, the Defendants have, either through direct affirmative actions or through knowing inaction, prevented Mr. Soliman from being awarded his commutation;

5

indeed, the hearing for his commutation (which had been scheduled for a specific date) has never taken place. These series of events were taken under color of state law and constitute violations of Mr. Soliman's civil rights. The first act of discrimination suffered by Mr. Soliman was that Defendant Hosterman refused to write a letter of recommendation on behalf of Mr. Soliman that would accompany his Petition. Defendant Hosterman also instructed others who Mr. Soliman might have gotten to write the letter of recommendation at DCC to refuse to write this letter. This letter of recommendation is a requirement that is needed for a successful petition. Defendant Hosterman has a history of unfairly treating Muslim inmates and his actions taken against Mr. Soliman are based upon Mr. Soliman's race and religion.

Later in April of 2004, another inmate at DCC was allegedly found to have cocaine in his cell. In order to effectively prosecute this inmate, corrections officers attempted to force Mr. Soliman to make a false statement against the accused inmate. Mr. Soliman refused. In response, an Internal Affairs investigator told him that if he continued to refuse to sign the false statement, false statements would be levied against him in retaliation. Mr. Soliman steadfastly refused to be bullied into signing the statement.

Shortly thereafter, another correctional officer at DCC warned Mr. Soliman to "watch his back" because there were DCC employees who were "out to get him," presumably in retaliation for his exercise of free speech and/or due to his race and/or religion. Mr. Soliman took heed of the warning, but failed to appreciate the extent to which these employees of DCC would go to retaliate against him. Moreover, Mr. Soliman failed to appreciate the

6

extent of the lawless environment under which the corrections officers are permitted to function at DCC – an environment which was known to exist, and permitted to exist by supervisory personnel in the Delaware Prison system, including Defendants Taylor, Howard, Carroll, McGuigan, Lupinetti, Pierce, Richardson and Hosterman.

The unfortunate effect of such a lawless environment became evident on May 12, 2004. Three days prior to that date, May 9, 2005, a package being carried by another inmate (i.e. not Plaintiff Soliman) was discovered to contain some contraband. During the ensuing investigation, the inmate who was carrying the package freely admitted to ownership. Nevertheless, based upon the contents of the package, which included certain material that was termed by Officer Lovett and Defendant Richardson as "Muslim Oil,"[1] it was concluded that the package necessarily belonged to Mr. Soliman – a practicing Muslim.

On May 12, Mr. Soliman was approached by six or seven corrections officers.[2] He was taken to a small room where his arms were handcuffed behind him and his legs were shackled to a chair. All of the corrections officers left the room except one. Defendant Richardson, who had been waiting in the room, also remained. Defendant Richardson then began to question Mr. Soliman about many incidents and subjects about which Mr. Soliman had no knowledge. He repeatedly referred to Mr. Soliman as the "Muslim Ringleader" and referred to him with other racially and religiously derogatory terms.

Mr. Soliman refused to admit to the accusations of Defendant Richardson and reiterated over and over again that he had no knowledge of the information that Defendant

---

[1] The bottle of "Muslim Oil" was in reality a bottle of cologne.

[2] The identities of these corrections officers are unknown at present and will be the subject of inquiry

Richardson sought.   In response, Defendant Richardson repeatedly punched the still shackled, handcuffed and defenseless Mr. Soliman.  Defendant Richardson then threatened to file a long list of charges against Mr. Soliman if he did not give Defendant Richardson the answers that he wanted. Even in the face of such intimidation, Mr. Soliman refused to provide Defendant Richardson with "information" that he knew to be false, or of which he had no firsthand knowledge.

At this point, Defendant Richardson left the room and returned with a thick telephone book.  Without warning, and from behind Mr. Soliman (who was still shackled and cuffed), Defendant Richardson reared back and, with what must have been full force, swung the telephone book, striking Mr. Soliman directly in the back of the head with such force that Mr. Soliman was knocked unconscious.

On information and belief, the other Defendants knew that the beating of Mr. Soliman was going to take place but failed to take any action to stop it, or at the least were indifferent to its occurrence.  Furthermore, similar beatings of inmates have taken place at DCC with the knowledge of all Defendants, yet armed with this knowledge, Defendants failed to take any action to prevent further beatings of other inmates, including Saad Soliman.

Mr. Soliman regained consciousness the following day. He was in excruciating pain from the beating – so much so that he could barely move. He also noticed that he was not in his cell, but instead in a small cell with nothing on but socks and underwear with cold air blowing on him. Approximately an hour and a half later, a correctional officer came by and

during discovery.

8

informed Mr. Soliman that he was in the SHU building, C-Tier Lower 3, also known as "The Hole."

Mr. Soliman was imprisoned in "The Hole" for approximately twenty-two days. During this time, he received no medical treatment for his injuries. There was also cold air, approximately 50 – 60 degrees, blowing on Mr. Soliman at all times. Mr. Soliman had no clothing or blankets for warmth – only his underwear and socks. Mr. Soliman was given very little food to eat, and was denied visitors, phone calls, and other basic privileges. During this time, Mr. Soliman sought to file grievances over the treatment that he received at the hands of Defendant Richardson and for the treatment, or lack thereof, that he received while housed in "The Hole." Specifically, Mr. Soliman requested a pen and grievance form from Sgt B. Thomas. Sgt. Thomas told Mr. Soliman that no inmate in "The Hole" was permitted to have these items and that he could file a grievance once his time in "The Hole" was over. Mr. Soliman made similar requests from other corrections officers in Building 18 while he was housed there and received the same response. (*See* Affidavit of Timothy J. Wilson, Esq. Exhibit B, hereinafter "Wilson Affidavit").

There is an internal DCC provision that requires an inmate to have a hearing within fifteen days of being placed in "The Hole" to address the charges against him. (*See* Wilson Affidavit). Mr. Soliman was not given his hearing until over three weeks after the beating. This delay was perpetrated to hide Mr. Soliman's appearance because at fifteen days, he still exhibited extensive facial bruising from the beating on May 12. When the hearing was finally held, on June 4, 2004, Mr. Soliman was found not guilty of all of the charges lodged

9

against him by Defendant Richardson. *At the close of the hearing, the hearing officer told Mr. Soliman that it was "beginning to appear like a personal crusade" against him and then stated "Saad, [Richardson's] after you ... be careful son."* Upon information and belief, all Defendants knew that Mr. Soliman was not given a timely hearing yet failed to take any action in that regard. Defendants also had knowledge of Defendant Richardson's "personal crusade" against Mr. Soliman. This "personal crusade" was based upon Mr. Soliman's race, religion and exercising his free speech right.

Following the hearing, and based upon the favorable result, Mr. Soliman immediately wrote to the classification personnel and requested that he be returned to his minimum security housing. This request has been ignored. Thereafter, in an effort to retain Mr. Soliman in maximum security, Mr. Soliman has been the victim of write-ups for the most insignificant infractions. Also, due to his increased security status, Mr. Soliman has been unable to proceed with his Commutation of Sentence hearing. The Defendants have intentionally sabotaged, either through their actions or their knowing inaction, Mr. Soliman's ability to have his sentence commuted because of his race, religion and because he exercised his right to free speech.

While housed in the SHU, Mr. Soliman attempted to file numerous grievances. As is discussed below, Mr. Soliman's journal was confiscated recently and, as a result, the specifics of the grievances are not currently available to him. Nevertheless, in general, Mr. Soliman asserts that he regularly filed the grievances on the 4 – 12 shift with Corrections Officer Kitchings or Sgt. Larry Conley. He also filed some of his grievances on the 8 – 4

10

shift with Sgt. Thomas. (*See* Wilson Affidavit). Although not all-inclusive, the topics of his grievances included: the delay that he experienced in receiving his mail; not having access to rehabilitative and/or academic program viewing as was requested by Counselor Todd Keener; the nature of the grievance procedure itself; and failure of Defendant Richardson to read Mr. Soliman his *Miranda* rights. Defendants responded to none of Mr. Soliman's grievances filed while he was housed in the SHU, except those relating to his failure to receive mail.

Mr. Soliman's grievance over the grievance procedure itself outlines what may be the likely reason why the grievances were not responded to by DCC. The grievance process is set up so that there is a secure grievance box located in each housing area. The inmates place their grievance paperwork in the boxes and then Lise Merson, the grievance officer, unlocks the boxes on a daily basis and collects the grievances. However, when an inmate is housed in the SHU, they do not have the freedom to physically place the grievance in the box. Instead, they must give the grievance to a corrections officer and trust that the officer places it in the box. Obviously this system is ripe for corruption in that the corrections officers may lose, or simply discard, the grievances. What is particularly troublesome is that often times the corrections officer against whom the grievances are filed is the very same person who must be entrusted to place the grievances in the box. (*See* Wilson Affidavit).

Mr. Soliman was housed at maximum security until September 20, 2004 when he was finally moved to the lower-security MHU Building 21. Mr. Soliman was housed in the MHU until last Thursday, February 3, 2005. On that date, Mr. Soliman was officially charged for

11

the May 9, 2004 incident, almost nine months after the alleged crimes, and moved back to maximum security, SHU. Upon information and belief, there is an institutional rule that requires charges against inmates to be addressed within 90 days. (*See* Wilson Affidavit).

Also, while Mr. Soliman was being fingerprinted (which is to say, last week on February 3, 2005), Defendant Richardson instructed Major Holman and Captain McCraver to remove all photos, paperwork and legal materials from Mr. Soliman's cell. Included in the confiscated materials was Mr. Soliman's journal that contained the specifics of all of the grievances that Mr. Soliman had filed while housed in the SHU. As a consequence, Mr. Soliman is not able to provide the Court with greater specificity regarding the grievances that he has filed. (*See* Wilson Affidavit).

While Mr. Soliman was being taken to the SHU, Defendant Richardson remarked to Mr. Soliman, "Pretty soon your little tirade for attention will be over too. You'll see then whose gonna help ya?" Upon information and belief, Defendant Richardson knew of the filing deadline for this brief and confiscated Mr. Soliman's journal and legal materials in an effort to thwart Mr. Soliman's and his counsel's efforts to prepare for this filing. Moreover, the filing of these nine-month old charges is blatant retaliation against Mr. Soliman due to his race, religion and his exercise of free speech. Furthermore, on information and belief, the other named Defendants in this action had knowledge of the most recent actions taken against Mr. Soliman and chose not to intervene, or were at the least indifferent to Defendant Richardson's crusade and vendetta. (*See* Wilson Affidavit).

12

## ARGUMENT

### I.    STANDARDS FOR MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT.

A motion to dismiss under Federal Rule of Civil Procedure 12 is designed to "test the

sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."

*ARGOS v. Orthotec LLC*, 304 F. Supp. 2d 591, 595 (D. Del. 2004).  Such a motion should

only be granted "if, after accepting as true all of the facts alleged in the  complaint, and

drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any

set of facts consistent with the allegations of the complaint. *Trump Hotels & Casino Resorts*

*v. Mirage Resorts*, 140 F.3d 478, 483 (3d Cir. 1998).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment

shall be entered if there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249,

91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  "The judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Id*.  In this role, the court must accept the non-moving party's evidence and

draw all inferences from the evidence in the non-moving party's favor. *Id*. at 255.

### II.    DEFENDANTS' MOTIONS RELY ON SUBMISSIONS OUTSIDE THE PLEADINGS AND THEREFORE ARE PROPERLY CONSIDERED AS MOTIONS FOR SUMMARY JUDGMENT.

"Rule 12(b) ... provide[s] for the conversion of motions under [that] section[] to Rule

56 motions for summary judgment when matters outside the pleadings are to be considered.

*Krauss v. Keibler-Thompson Corp.*, 72 F.R.D. 615, 617 (D. Del., 1976). Here Defendants have submitted the Affidavits of Evelyn J. Stevenson and Corporal Lise M. Merson. Should the Court consider those submissions, then Defendants' Motions must be converted to Motions for Summary Judgment.

## III. PLAINTIFF'S AMENDED COMPLAINT BASES THE INDIVIDUAL DEFENDANTS' § 1983 LIABILITY UPON: (1) THEIR ACTIONS TAKEN IN THEIR INDIVIDUAL CAPACITIES; AND/OR (2) THEIR SUPERVISION OF SUBORDINATES CONDUCTED WITH DELIBERATE INDIFFERENCE AND WITH A CULPABLE STATE OF MIND TO THE PLIGHT OF MR. SOLIMAN.

Defendants' I.D. Opening Brief addresses the issue of supervisory liability from two separate angles. The first that is that all of the Defendants, with the exception of Defendants Hosterman and Richardson, had no personal involvement with the alleged violations, and secondly that Plaintiff's claims are improperly based upon *respondeat superior*. Although bifurcated in Defendants' Motion, these two arguments ultimately fall under the same analysis: whether a state official may incur § 1983 liability for constitutional violations not directly inflicted by his own hand. The answer to this question is unequivocally – *yes*.

### a. Plaintiff sufficiently pled his civil rights allegations.

Defendants appear to suggest that Mr. Soliman allege with minute detail every single action that every single Defendant took that resulted in his constitutional violations. Such a burden on Plaintiff at this stage in this case, *before any discovery has occurred*, is patently unfair to Plaintiff. The Third Circuit made such a holding in *Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir. 1999, cert. den. 528 U.S. 1005 (1999). In that case, alleging, *inter*

14

*alia*, wrongful policies and failure to train, the lower court held that the plaintiff had not satisfied his pleading requirements. The Third Circuit reversed, holding:

> The District Court's insistence that [plaintiff] must identify a particular policy and attribute it to a policymaker, at the pleading stage without benefit of discovery, is unduly harsh. [Plaintiff] is not engaged in a mere fishing expedition. [Plaintiff] alleges that he spent ten years in prison as a result of a pervasive pattern of egregious, unconstitutional conduct by Philadelphia's police. He surmises, reasonably, that such misconduct reflects inadequate training and supervision. He *cannot be expected to know, without discovery*, exactly what training policies were in place or how they were adopted.

*Id.* at 358 (emphasis added).

Here, as an inmate who has been housed in maximum security for five of the last nine months, Mr. Soliman cannot be expected to know every action or inaction taken against him by each individual defendant. Indeed, it is hard to see how any inmate in Mr. Soliman's position could have *any* knowledge as to specifics, beyond the knowledge (knowledge which, we would submit, is quite telling) that there had been a deafening administrative silence in response to his grievances and complaints. Development of specific information awaits discovery, where a starting point may be the discovery of information from the administrative hearing officer who indicated to Mr. Soliman that he should "be careful son."

With respect to a Civil Rights complaint, all that is required are allegations as to when the event occurred, where the event occurred, and the persons responsible. *Boykins v. Ambridge Area School Dist.*, 621 F.2d 75, 80 (3d Cir. 1980). In contrast, *Rotolo v. Borough of Charleroi*, 532 F.2d 920 (3d Cir. 1976), held that a complaint that merely alleges a "denial of the Plaintiff's First Amendment rights" is insufficient. 532 F.2d 921.

15

Here, Mr. Soliman met his pleading burden. Instead of conclusory statements that the Defendants denied him his rights, Mr. Soliman alleges the specific actions that constitute violations of his specific civil rights. Importantly, he also alleges *inaction* by Defendants who had knowledge of constitutional violations. As is established below, such inaction with knowledge also imputes liability to a defendant. Mr. Soliman has set forth a recitation of the dates when the events occurred, where they occurred and the persons responsible – nothing more is required.

### b.    Plaintiff Claims are Correctly Based upon Supervisory Liability – Not *Respondeat Superior.*

Defendants incorrectly assume that Mr. Soliman bases his claims upon a theory of *respondeat superior.* Defendants' assumption appears to be based upon the fact that the Defendants in this case hold supervisory positions with the Department of Corrections and/or the Delaware Correctional Center. "When state officials are sued in their individual capacity, the eleventh amendment does not bar damage suits against them for deprivations of federal rights caused by those officials under color of state law." *Sample v. Diecks*, 885 F.2d 1099, 1112 (3d Cir. 1989).

A plaintiff in a civil rights case may not predicate liability "solely on the operation of *respondeat superior.*" *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). This rule of law however, does not absolve a supervisory employee from liability for violations that occur at a facility over which he they holds supervisory authority. *See, Pennsylvania v. Porter*, 659 F.2d 306, 323-324 (3d Cir. 1981). Simply put, supervisory liability is not foreclosed by § 1983. There are two ways that an official may be held liable under § 1983

16

for constitutional violations: (1) by "subjecting the plaintiff to the constitutional violation" or (2) "for someone else's constitutional tort, that is, for 'causing' the plaintiff to be subjected to the constitutional violation." *Sample*, 885 F.2d at 1112.

In *Sample v. Diecks, supra,* the United States Court of Appeals for the Third Circuit specifically considered the issue of whether the Commissioner of the Pennsylvania Bureau of Corrections could be held liable under § 1983 based upon "the adequacy of [the Commissioner's] supervision of the prison system." *Id.* at 1116. The Court recognized the principle that a supervisory employee may be held liable for constitutional torts of subordinate employees, or for shortcomings in the prison system, if the supervisor exhibits "deliberate indifference to the plight of the person deprived." *Id.* at 1118; and *Church v. Dept. of Correction*, 2002 WL 31927434 *3 (D. Del. 2002)(attached to *Defs.' Opening Br.*).

Defendants paraphrase *Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981) as standing for the rule of law that "Plaintiff must: 1) identify with particularity what the *supervisory official* failed to do which amounts to deliberate indifference; and 2) demonstrate a close causal connection between the identified deficiency and the ultimate injury." (*Defs.' Opening Br.* at 7). Interestingly, the portion of this opinion from which Defendants' paraphrase is elicited is the *dissent* to the opinion.

Notwithstanding the Defendants misplaced reliance upon this passage in *Porter*, that case is instructive on the issue of supervisory liability. There, the Court found that the Police Chief of the Borough of Millvale, Pennsylvania was responsible for constitutional torts committed by a subordinate employee of the Borough of Millvale by virtue of his knowledge,

17

acquiescence and support of the officer actions. 659 F.2d at 321–322. The Court also found the Mayor of Millvale responsible for his failure to suspend the subordinate until Town Counsel had the opportunity to act. As a result of his inaction, the Court held that the Mayor was "affirmative[ly] involve[d] in [the subordinate's] illicit practices." *Id*. at 322. Finally, the Court found the Borough Council could be held culpable because it failed to take action against the subordinate. "[B]y inaction, [the Council] tacitly approved [the Police Chief's] decision [to leave the subordinate on active duty]." *Id*. at 323.

As applied to Mr. Soliman's case, although not all of the Defendants' hands were grasping the telephone book as it struck Mr. Soliman on the back of the head as he sat handcuffed and shackled to a chair; although the words "sand nigger," "camel lover" and "rag head" were not spoken to Mr. Soliman by each and every one of the Defendants; although not all of the Defendants physically threw an unconscious Mr. Soliman in "The Hole" and turned the key to lock the door behind him; and although all of the Defendants did not directly communicate to Mr. Soliman their refusal to provide proper food, medical care and religious opportunities to Mr. Soliman; *all of the Defendants* bear responsibility for the constitutional violations because they all played an active role in such violations in that they were and/or remain deliberately indifferent to Mr. Soliman's situation despite their knowledge of his plight. Moreover, all of the Defendants instructed the acting Defendants to perform the actions, and/or fostered, encouraged and condoned such actions, and/or knew that the actions occurred or were occurring at DCC and affirmatively chose to permit the

18

actions to occur. Once Plaintiff is allowed to take discovery and depose witnesses, the particularity of each Defendants' actions will be clearly identifiable.

Mr. Soliman's Amended Complaint specifically alleges that the Defendants knew or were aware of the constitutional violations suffered by Mr. Soliman. By their inaction, these Defendants tacitly approved of these violations. Accordingly, *Sample v. Diecks, supra*, and *Pennsylvania v. Porter supra*, demand that Mr. Soliman's claims against these Defendants survive this Motion. Furthermore, Mr. Soliman's claims may survive based upon the inadequacy of the supervision of the prison system at DCC. *Sample v. Diecks*, 885 F.2d at 1116.

## IV. PLAINTIFF FULFILLED HIS OBLIGATIONS UNDER THE PRISON LITIGATION REFORM ACT, 42 U.S.C. § 1997(E), WHEN HE FILED GRIEVANCES FOR ALL OF THE CONSTITUTIONAL VIOLATIONS FOR WHICH HE SEEKS RELIEF.

An inmate must exhaust his administrative procedures, *so long as* there are administrative procedures made available to him. The determination of whether an inmate has exhausted his administrative remedies "is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances, *and the waiver, if any, of such regulations by prison officials.*" *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004)(emphasis added). With respect to cases in which § 1997(e) is applicable, "[a]ll "*available*" remedies must now be exhausted ..." *Porter v. Nussle*, 534 U.S. 516, 524 (2002)(emphasis added). "The jail cannot fail to follow through on promised action and then

19

reasonably fault the plaintiff for failing to complete the administrative review process." *Myers v. McAuley*, 2002 U.S. Dist. LEXIS 17001 *10 (D. Ill. 2002)(attached at Tab 1).

Here, the Defendants assert that the only grievances filed by Mr. Soliman in 2004 pertained strictly to his television video connection and the receipt of his subscription to *Smooth* magazine. In support, they submitted the Affidavit of Corporal Lise M. Merson. Because, they argue, Mr. Soliman failed to file grievances over his constitutional violations, Defendants assert that he has therefore failed to exhaust his administrative remedies. In response, Mr. Soliman submits his own sworn affidavit (attached hereto as Exhibit A) which states that he did in fact file grievances based upon the actions outlined in his Amended Complaint.

Because Mr. Soliman was not permitted to file grievances while housed in "The Hole," all of these grievances were "filed" while Mr. Soliman was housed in the SHU. This is significant in that the only means by which an inmate at DCC may file a grievance while housed in the SHU is to pass it on to his corrections officer and trust that his corrections officer will file the grievance. In other words, an inmate who is housed at maximum security may not file the grievance on his own and must therefore depend upon a DCC employee to file the grievance paperwork. As a result, once the inmate hands the grievance paperwork to his corrections officer, the inmate has no control *whatsoever* over whether his grievance is filed; whether his grievance is stuffed into a desk drawer and forgotten; or whether his grievance is thrown in the trash can.

Mr. Soliman asserts that (assuming as true Corporal Merson's sworn statement that his grievances were never filed) there was necessarily some breakdown in the process at DCC whereby grievances are filed. In the alternative, perhaps the grievances were delivered to the proper office for filing, but once there, they were either lost or destroyed.[3]

A similar factual scenario occurred in *Myers, supra*. There the plaintiff brought an action under § 1983 claiming a violations of his civil rights by the defendants by virtue of their deliberate indifference to his serious medical needs. The defendants sought to have the case dismissed, contending that the plaintiff failed to exhaust all of his administrative remedies. In denying the motion to dismiss, the Court noted that the amended complaint contained allegations that the plaintiff had "made numerous efforts to avail himself of the grievance process but received no responses to his grievances" from the prison. *Myers*, 2002 U.S. Dist. LEXIS 17001 *8.

Moreover,

> all but one of the plaintiff's grievances were evidently lost or destroyed without being addressed. The court finds as a matter of law that because no action was taken on those grievances, the plaintiff had *no "available"* administrative remedy and thus cannot be barred from pursuing relief in federal court.

*Id*. at *9. (emphasis added).

Much like the grievances prepared by the plaintiff and ultimately ignored by defendants in *Myers*, Mr. Soliman's grievances remain unaddressed by prison officials – be it

---

[3] Ironically, one of the grievances filed by Mr. Soliman while housed in the SHU pertained to the grievance process itself. Specifically, it alleged the lack of security and its lack of a means by which an inmate housed in the SHU may be certain that his grievance is filed and filed in a timely manner.

21

by intent or by negligence. Whatever the reason, *Myers* instructs that by virtue of Mr. Soliman's ill-fated attempt to utilize the grievance process, he has, in fact, exhausted all administrative remedies that were available to *him* at DCC. As a consequence, Defendant's Motion must be denied based upon their argument that he failed to exhaust those administrative remedies.

Similarly, in *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001), a case cited with approval by the Third Circuit in *Mitchell v. Horn*, 318 F.3d 523, 529 (3d. Cir. 2003), the plaintiff brought a deliberate indifference claim against various employees of the correctional system as a result of another prison inmate stabbing the plaintiff. On appeal, plaintiff argued that he was prevented from utilizing the prison grievance system. The court held: "We believe that a remedy that prison officials prevent a prisoner from utilizing is not an available remedy under § 1997e(a), and that [plaintiff's] allegations raise an inference that he was prevented from utilizing the prison's administrative remedies." *Id*. 740.

Here, Mr. Soliman availed himself to utilize the grievance process but it was not made available to him. While in "The Hole" he requested and was denied the materials necessary to file grievances. While housed in the SHU, grievance materials were available to Mr. Soliman, and he filed numerous grievances at that time, yet there was some breakdown in the process whereby his grievances either were lost or destroyed. As a result, Mr. Soliman did everything that he could to utilize that process and thus, exhausted all remedies that were *available to him*.

22

In addition, as a practical matter, according to DOC procedures, no administrative remedy was available to Mr. Soliman. The second page of the DCC grievance form, lists seven areas in which a grievance would be returned as an "Unprocessed Grievance." (*see*, Exhibit C). The last of these areas states that an inmate must file the grievance within seven days of the occurrence. Specifically:

> Intake Action:  This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance procedure" for the following reasons(s):
>
> . . .
> _____ **Expired filing period.**  Grievance exceeds seven (7) days from date of occurrence.

Recall, that despite his repeated requests to various corrections officers, Mr. Soliman was not permitted to have a pen or grievance form while incarcerated in "The Hole." He was told that he would have to wait until he was released from "The Hole." Given the fact that he was held in "The Hole" for twenty-two days, any filing made thereafter, even if they were received and addressed by Lise Merson, would have necessarily been procedurally dismissed under DOC Procedure 4.4 as the filing period would have expired.

In *Ruffin v. Taylor*, 166 F.Supp.2d 999 (D. Del.), an inmate at DCC filed a lawsuit against individual defendant employees of DOC and DCC (including Defendant Taylor) alleging constitutional violations over a beating that he suffered at the hands of the defendants. Much like the factual backdrop of the instant case, the plaintiff in *Ruffin* was handcuffed and shackled and then beat and kicked him. In moving for summary judgment, the defendants claimed that the plaintiff had failed to exhaust his administrative remedies.

23

In that case, the evidence showed that the plaintiff sought to utilize the grievance procedure to in response to the beating. However, the Grievance Chairperson held that such beatings do not raise issues that are greivable. Therefore, Judge McKelvie, held "[g]iven these circumstances, [plaintiff] did exhaust the procedures available to him under the prison grievance procedure." *Id.* at 1004. As applied to this case, even if one were to conclude that Mr. Soliman did not file the grievances as he alleges in his sworn statement. Such a failure would not be fatal to his claims over the beating because the prison grievance process provides no remedy for him – as was stated by the Grievance Chairperson in that case (Lise Merson now holds that position).

The facts of *Ruffin* are also significant to Mr. Soliman's case in that very similar conduct was perpetrated by DCC employees, against a DCC inmate, in the very same institution, DCC, and under the very same supervision, Defendant Taylor. Such similarities raise an inference that such actions are permitted, and indeed tacitly *encouraged* by those in charge of the DOC and DCC. This case further establishes that Mr. Soliman's case was not an isolated incident.

One with a skeptical mind might think that perhaps, with this Complaint, Mr. Soliman is attempting an end run on his duty to exhaust his administrative remedies. However, such an "end run" is completely out of character with Mr. Soliman's previous utilization of the prison grievance process (while he was housed at a lower security level and could file the grievances himself). Mr. Soliman regularly utilized the grievance process both before and after his incarceration in the SHU. (*See,* Exhibit D). It is curious indeed that an

24

inmate would regularly file grievances before he was housed in maximum security, decide to stop filing them while he was housed in maximum security, and then decided to start filing them again once he was released from maximum security.

Moreover, would an individual who utilized the grievance process over not receiving his *Smooth* magazine, or who utilized the grievance process to complain about his video/cable connection, such as Mr. Soliman did, *not* utilize that process over issues as serious as violations of his constitutional rights? The answer to this question is obviously – *no*. Logically, it just does not add up. Even if one were to forget for a moment the existence of Mr. Soliman's sworn statement that he filed these grievances, common sense dictates that Mr. Soliman *did, in fact,* file grievances pertaining to the violations of his constitutional rights as set forth in the Amended Complaint. Why those grievances were not addressed is a question that must be addressed in discovery and perhaps is a question that will ultimately be left to the jury.

## V.    DEFENDANTS MAY NOT PLACE A PLAINTIFF AT A HIGHER SECURITY LEVEL, DENY HIM PRISON EMPLOYMENT, DENY HIM REHABILITATIVE PROGRAMS, OR DENY HIM THE DOCUMENTATION REQUIRED FOR A COMMUTATION OF SENTENCE HEARING, IF SUCH DENIALS ARE BASED UPON HIS RACE, RELIGION OR AN EXERCISE OF FREE SPEECH.

Defendants go to great lengths to establish that Mr. Soliman may not claim that he was denied due process with respect to his security level classification, his rehabilitation,[4] his prison employment or his commutation of sentence hearing. Defendants contend that Mr.

---

[4] Defendants specifically address Mr. Soliman's absence of rights to prison rehabilitation programs. Yet in his Complaint, Mr. Soliman made no reference whatsoever regarding being denied such programs. Curiously, Mr.

Soliman has no liberty interest with respect to those issues. This argument is somewhat misleading in that Mr. Soliman made no *due process* claim in his Amended Complaint based upon the actions taken against him by Defendants in regards to these issues.

Mr. Soliman *does* however assert that all of these opportunities were improperly taken from him based upon his exercising his right to free speech and/or his race and/or religion. It is here that Defendants' actions are impermissible.

> Thus, prison officials may transfer a prisoner to administrative segregation for any reason, or no reason, so long as the reason is *not based on race, religion or the exercise of a protected free speech right.*

*Jackson v. Sherese Brewington-Carr*, 1999 U.S. Dist. LEXIS 535 (D. Del. 1999); *see also, Blizzard v. Watson*, 892 F. Supp. 587, 597 (D. Del., 1995); and *Block v. Potter*, 631 F.2d 233, 237 (3d Cir. 1980).

> Although inmates have no right to a particular job assignment while they are incarcerated, prison officials cannot discriminate against an inmate by making a job assignment on the basis of race.

*Williams v. Federal Bureau of Prisons and Parole Comm'n.*, 85 Fed. Appx. 299, 305 (3d. Cir. 2004)(internal citation omitted).

Stated differently, Mr. Soliman concedes that he has no constitutionally protected *entitlement* in his security classification, his right to prison employment, his right to rehabilitative programs and his right to a commutation of sentence hearing. However, the Defendants may not deny him these opportunities based upon race, religion or due to an exercise of free speech. *Id.*

---

Soliman did, in fact, file a grievance over being denied prison rehabilitative opportunities.

It is exactly upon these racial, religious and speech grounds that Defendants have denied Mr. Soliman. Recall that the genesis of this lawsuit is found in Defendants' racism and religious discrimination toward Mr. Soliman, who is a Muslim of Middle Eastern descent, after he filed for his commutation of sentence. The Defendants took action against him based upon their racial and religious animus toward Mr. Soliman. Also recall the free speech issue – where Mr. Soliman refused to sign the affidavit that contained false information about another inmate. In addition to race and religious discrimination, Mr. Soliman's rights were violated as retaliation for this exercise of his right to free speech. Simply stated, although Mr. Soliman was given no process before he was unjustly and excessively punished, his claims regarding his employment, rehabilitative programs, security level and commutation of sentence hearing were violated based upon race and religious discrimination as well as violations of his First Amendment rights.

## VI.    THE DEPARTMENT OF CORRECTION IS A "PERSON" UNDER § 1983.

Defendant, DOC, asserts that it is not a "person" as that term is used in § 1983, but rather an arm of the state. It therefore claims immunity under the Eleventh Amendment. A subdivision of the state is not automatically afforded "alter ego" or "arm" of the state status for purposes of Eleventh Amendment immunity. The Third Circuit has articulated a three-part inquiry to make such a determination.

> (1) whether, in the event the plaintiff prevails, the payment of the judgment would come from the state (this includes three considerations: whether the payment will come from the state's treasury, whether the agency has sufficient funds to

27

satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) the status of the agency under state law (this includes four considerations: how state law treats the agency generally, whether the agency is separately incorporated, whether the agency can sue and be sued in its own right, and whether it is immune from state taxation); and

(3) what degree of autonomy the agency enjoys.

*Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1144-1145 (3d. Cir. 1995)(parenthesis in original)(citing, *Peters v. Del. River Port Authority*, 16 F.3d 1346, 1350 (3d Cir. 1994)). Based upon the factual record as it exists at present, which is essentially non-existent, there is an insufficient factual basis to conclude whether or not the DOC qualifies as an alter ego of the State, or whether it is a "person" under § 1983. Therefore, a genuine issue of material fact exists on this point and the DOC's Motion must be denied as a result.

Should the DOC attempt to introduce additional evidence and/or argument on this issue in their Reply Brief, Mr. Soliman reserves the right to respond in kind in a supplemental brief.

## VII.   THE DELAWARE GENERAL ASSEMBLY WAIVED STATE IMMUNITY BY ENACTING 18 *Del. C. § 6511,* ENTITLED "*DEFENSE OF SOVEREIGNTY PROHIBITED*".

Defendant DOC contends that this Court lacks subject matter jurisdiction because it is immune from suit by virtue of the Eleventh Amendment. Article I, § 9 of the Delaware Constitution provides that the only means whereby the State of Delaware's sovereign

28

immunity may be limited or waived is by act of the Delaware General Assembly. "On

numerous occasions, Delaware courts have urged the General Assembly to remove the bar to

recovery which this doctrine presents." *Doe v. Cates*, 499 A.2d 1175, 1177 (Del. 1985).

> The reason, of course, is that the State, acting through its
> agents, does cause injury to others for which, in justice, it
> should be legally responsible. And a concept which draws its
> strength from the notion that the State is outside the law is
> hardly at home in our third century of independence.

*Pajewski v. Perry*, 363 A.2d 429, 433 (Del. 1976). The General Assembly enacted 18 *Del.*

*C.* ch. 65 with an apparent intent to carry through such a waiver and to "alleviate the injustice

created by the doctrine [of sovereign immunity]" *Doe v. Cates*, 499 A.2d 1177.

The relevant section of that provision is 18 *Del. C.* § 6511, entitled *Defense of*

*Sovereignty Prohibited.* That statute reads:

> The defense of sovereignty is waived and cannot and will not
> be asserted as to any risk or loss covered by the state
> insurance program, whether same be covered by
> commercially procured insurance or self-insurance, and every
> commercially procured insurance contract shall contain a
> provision to this effect, where appropriate.

This provision creates a "presumptive waiver of the sovereign immunity defense." *Doe v.*

*Cates*, 499 A.2d at 1177; and *Pajewski*, 363 A.2d at 436. In this regard,

> it is, therefore, incumbent upon the State to provide all of the
> facts as to how the Committee met its responsibilities under
> 18 *Del. C.* ch. 65. These include what decisions the
> Committee has made as to the kids of risk here involved,
> whether self-insurance is or was feasible to provide coverage
> for such risk and the reason for no coverage.

*Pajewski*, 363 A.2d at 436.

29

Stated differently, the only manner in which the State may claim sovereign immunity is to provide evidence that conclusively establishes that the State does not insure itself in any way, either through self-insurance or through commercial insurance for the liability arising from the claims as set forth in the Amended Complaint. In addition, if this first hurdle is cleared, the State must also provide a legitimate reason as to why it has failed to insure itself against such liability. DOC has failed to meet its burden.

## CONCLUSION

**WHEREFORE**, Plaintiff respectfully requests that this honorable Court deny Defendant's Motion to Dismiss for Partial Judgment as a Matter of Law on Plaintiff's Hostile Work Environment Claim.

Respectfully submitted,

Jeffrey K. Martin, Esquire (#2407)
Timothy J. Wilson, Esquire (#4323)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680

/s/ Herbert G. Feuerhake

Herbert G. Feuerhake, Esquire (ID # 2590)
The Law Office of Herbert G. Feuerhake
521 West Street
Wilmington, Delaware 19801
(302) 658-6101

*Attorneys for Plaintiff Saad Soliman*

Dated: September 26, 2005

30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAAD M. SOLIMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-1378 (GMS) |
| | ) |
| STANLEY TAYLOR; PAUL HOWARD; | ) |
| THOMAS CARROLL; LAWRENCE | ) JURY TRIAL DEMANDED |
| McGUIGAN; JAMES LUPINETTI; DAVID E. | ) |
| PIERCE, Jr.; JOSEPH B.RICHARDSON; | ) |
| RONALD HOSTERMAN; CERTAIN | ) |
| UNKNOWN INDIVIDUAL EMPLOYEES OF | ) |
| THE DELAWARE DEPARTMENT | ) |
| OF CORRECTION; and STATE OF | ) |
| DELAWARE DEPARTMENT OF | ) |
| CORRECTION, | ) |
| | ) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

I, Jeffrey K. Martin, do hereby certify that on September 27, 2005, I electronically filed the *Amended Plaintiff's Answering Brief to Individual Defendants and Defendant State of Delaware Department of Correction's Motions to Dismiss/Summary Judgment Pursuant to Rules 12(b)(1) and 56(c)* and the *Certificate of Service* for same with the Clerk of the Court using CM/ECF which will send notification of such filing, and have also sent two (2) true and correct copies of *Amended Plaintiff's Answering Brief to Individual Defendants and Defendant State of Delaware Department of Correction's Motions to Dismiss/Summary Judgment Pursuant to Rules 12(b)(1) and 56(c)* and the *Certificate of Service* for same via first class U.S. Mail, postage prepaid to the following:

Aaron R. Goldstein, DAG (ID# 3735)
Carvel State Office Building, 6th Floor
820 North French Street
Wilmington, DE  19801

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, Delaware 19806